UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| D.D.H., a minor by her mother,<br>PATRICIA DOWNS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:14-cv-01051-SEB-DML |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## Report and Recommendation on
## Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C.

§ 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its

appropriate disposition.  (Dkt. 14)  As addressed below, the Magistrate Judge

recommends that the District Court AFFIRM the decision of the Commissioner of

the Social Security Administration that D.D.H. is not disabled.

## Introduction

D.D.H., a minor ("Claimant"), by her mother Patricia Downs, seeks judicial

review of a final decision of the Commissioner of the Social Security Administration

denying her application for Supplemental Security Income ("SSI") disability benefits

under Title XVI of the Social Security Act.  Ms. Downs filed an application for

disability benefits for her daughter on June 27, 2011, alleging D.D.H. had become

disabled because of asthma as of February 21, 2010, shortly after her birth.  The

application was denied initially on August 22, 2011, and denied upon reconsideration on October 11, 2011.  After the SSI application was filed, D.D.H. was treated for a deformity affecting her right hip.  This impairment was diagnosed after D.D.H. had started walking. D.D.H. underwent surgery for this condition in September 2012.

Acting for the Commissioner following a hearing held November 21, 2012, administrative law judge T. Whitaker issued a decision on February 4, 2013, in which she found D.D.H. is not disabled.  The Appeals Council denied review of the ALJ's decision on April 23, 2014, rendering it the final decision of the Commissioner.  The Claimant timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

## Standard for Proving Disability

A child under the age of 18 is eligible for disability benefits under the SSI program if she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The SSA has implemented this statutory standard by, in part, prescribing a three-step sequential evaluation process.  20 C.F.R. § 416.924.  Step one asks if the child is engaged in substantial gainful activity (*i.e.,* is earning money at a certain level); if she is, then she is not disabled. § 416.924(b).  Step two asks whether the child's impairments, singly or in combination, are severe; if they are not, then she is not disabled.

§ 416.924(c).  The third step is an analysis of whether the child's impairments, either singly or in combination, meet or equal the criteria of any of the conditions in the Part B Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.  If they do and the duration requirement is satisfied, then the child is deemed disabled.  §416.924(d).

The Part B Listing of Impairments is a compilation of medical conditions divided into fourteen major body systems that the SSA has adjudged are disabling in children.  20 C.F.R. § 416.925.  In general, each listed condition is defined by two sets of criteria:  (1) diagnostic findings that substantiate the existence of a listed condition and (2) sets of related functional limitations that substantiate the condition's disabling severity.  *Id.*  A child's impairment or group of impairments can satisfy a listed condition in one of three ways:  by meeting all the listed criteria, 20 C.F.R. § 416.925(c)(3); by medically equaling the criteria, 20 C.F.R. § 416.926 (*i.e.,* the impairments do not match the listed criteria for a listed condition but they are of "equal medical significance" to those criteria or condition), or by functionally equaling the criteria, 20 C.F.R. § 416.926a(a).

Functional equivalence involves an analysis of six "domains" of functioning and determination of whether and the extent to which a child's impairments limit her functioning in those domains.  The domains are:

- (1) acquiring and using information,

- (2) attending to and completing tasks,

- (3) interacting and relating with others,

- (4) moving about and manipulating objects,

- (5) caring for self, and

- (6) health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  If the child's impairments cause "marked" limitations in
at least two domains, or cause "extreme" limitations in at least one domain, then
her medical condition is functionally equivalent to a listing and she is disabled.  20
C.F.R. § 416.926a(d).  In general, a "marked" limitation exists when a child's
impairment(s) "interfere[] seriously with [her] ability to independently initiate,
sustain, or complete activities" within a particular domain.  It is a limitation that is
"more than moderate" but "less than extreme."  20 C.F.R. § 416.926a(e)(2).  An
"extreme" limitation is one that "very seriously" interferes with a child's ability to
initiate, sustain, or complete activities within a domain.  20 C.F.R. § 416.926a(e)(3).

### Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is
deferential.  A court must affirm if no error of law occurred and if the findings are
supported by substantial evidence.  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th
Cir. 2001).  Substantial evidence means evidence that a reasonable person would
accept as adequate to support a conclusion.  *Id.*  The standard demands more than a
scintilla of evidentiary support, but does not demand a preponderance of the
evidence.  *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for
her decision to accept or reject specific evidence of a disability.  *Scheck v. Barnhart,*

357 F.3d 697, 700 (7th Cir. 2004).  The ALJ need not address every piece of evidence in his decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions.  *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

### I.     The ALJ's Findings

The Claimant was born in February 2010, and was an older infant at the time her SSI application was filed. She was nearly three years old at the time of the ALJ's decision.

The ALJ found D.D.H. had severe impairments of asthma and "right valgus osteotomy for congenital coxa vara of the right hip associated with a deformity of the right femoral epiphysis likely due to an old fracture and characterized by a gait abnormality."[1]  (R. 13).  The ALJ evaluated the hip impairment against child's listing 101.02 (major dysfunction of a joint) and the asthma impairment against the four subparts of child's listing 103.03 (asthma), and determined the impairments did not meet or medically equal any listed impairment.

#### Hip Impairment

Listing 101.02 requires, *inter alia,* that the joint dysfunction result in an "inability to ambulate effectively."  In applying this listing, the ALJ discussed that

---

[1]      Coxa vara is a condition in which the neck of the femoral bone sits at an unusually horizontal angle into the hip.  *See* http://www.cincinnatichildrens.org/ health/c/coxavara.  It affects proper hip alignment.  *Id.*

D.D.H.'s gait abnormality was noted in November 2011 after she began walking and exhibited a limp.  An x-ray showed a femoral deformity, which may have been due to an old fracture or was congenital.  (R. 14).  About six months later, D.D.H. was seen by an orthopedic specialist for follow-up.  She limped and her range of motion at the right hip was restricted.  A new x-ray showed the condition was unchanged from the November 2011 x-ray and the orthopedist diagnosed "right congenital coxa vara."  (*Id.*).  In September 2012, D.D.H. underwent surgery (a "right valgus derotational osteotomy") to correct the bone-neck angles.  At a post-operative check-up two weeks later, D.D.H.'s mother reported D.D.H. was walking well at home "with no issues."  (R. 204).  The surgeon advised going "slow with ambulation."  (R. 14, 204).  He planned a follow-up appointment in one month for x-rays and "recheck" (*id.*), but no follow-up was documented in the medical records.  (R. 14).

At the hearing, D.D.H.'s mother testified D.D.H. had some difficulties with walking and sometimes complained that her hip hurt.  She also said D.D.H. could walk to a building several doors away from their home and could play with other children for thirty minutes before complaining about hip pain.  D.D.H. also could go up and down stairs if she walked slowly.  The mother sometimes carried D.D.H. up and down stairs and sometimes carried her instead of letting D.D.H. walk.

In determining listing 101.02 was not met or medically equaled, the ALJ emphasized the lack of evidence showing D.D.H. had an inability to ambulate effectively.  That phrase is defined by SSA as an "extreme limitation of the ability to walk, i.e., an impairment that interferes very seriously with the child's ability to

6

independently initiate, sustain, or complete activities." In addition, it generally requires the inability to ambulate independently without using a hand-held assistive device(s) that limits the functioning of both upper extremities. *See* listing 101.00(2)(b). D.D.H. does not use a hand-held assistive device, and the ALJ found the other evidence of D.D.H.'s ambulation activities to be inconsistent with the required "extreme" limitation on the ability to walk, as was the fact there had been no medical follow-up after D.D.H.'s post-surgery appointment with the orthopedist. (R. 14-15).

Asthma

Listing 103.03 (asthma) has four subparts. The ALJ evaluated the evidence against each one and found that the severity required by the listing subparts was not demonstrated in the record. (R. 15-17). For example, one subpart requires evidence of asthma attacks "in spite of prescribed treatment and requiring physician intervention" at least every two months or at least six times a year (*see* 1003.03(B)), but there was no evidence of that frequency with physician intervention. In addition, the consultative examiner who evaluated D.D.H. in August 2011 stated D.D.H. had "very mild asthma" controllable by medication. (R. 15). The opinions of state agency doctors, rendered in August and October 2011, who reviewed the medical evidence also found no listings were met or medically equaled. Indeed, they found D.D.H.'s respiratory difficulties, as described in the medical records, did not constitute even a severe impairment. (R. 18).

The ALJ then turned to the six domains of functioning that must be analyzed to decide whether a child's impairments "functionally equal" a listing. Functional equivalence requires marked limitations in at least two domains or an extreme limitation in one domain. The ALJ determined D.D.H. has no limitations in (a) acquiring and using information, (b) attending and completing tasks, and (c) interacting and relating with others. She found less than marked limitations in (d) moving about and manipulating objects, (e) caring for self, and (f) health and physical well-being.

Accordingly, the ALJ determined D.D.H. is not disabled.

## II.   **The Claimant's Assertions of Errors**

The Claimant contends the ALJ's analysis is flawed in three ways. First, she contends that because no state agency physician examined the evidence of D.D.H.'s hip impairment, surgery, and follow-up records, the ALJ could not rationally conclude listing 101.02 was not met or medically equaled. Second, she contends the evidence showed D.D.H. suffered from asthma consistent with listing 103.03C2. Third, she contends the ALJ should have found D.D.H. was markedly limited in two domains: (1) moving about and (2) health and physical well-being. The court will address each assertion of error in turn.

### A.   **The ALJ's Evaluation of Listing 101.02**

The court disagrees that an evaluation by a state agency expert of the medical evidence surrounding D.D.H.'s hip impairment and ambulation was required in this case to support the ALJ's conclusion that listing 101.02 was not met

or medically equaled.  The ALJ reviewed and discussed all of the pertinent medical evidence, including the orthopedist's evaluations of D.D.H.'s impairment and follow-up care.  That evidence demonstrated D.D.H.'s femoral-bone to hip-bone malformation was surgically corrected by an orthopedic surgeon.  And, except for an immediate follow-up examination by the surgeon, there was no indication D.D.H. was seen again by a physician related to her hip impairment or with respect to any ambulation difficulties.  The ALJ's discussion of the mother's testimony about D.D.H.'s walking, climbing stairs, and playing activities sufficiently supported her conclusion there was no evidence D.D.H. exhibited an extreme limitation in her ability to walk that interfered "very seriously" with her ability to sustain activities, as addressed for listing 101.02.

D.D.H. contends that if experts had reviewed the "treatment and surgical evidence from 11-7-11 to 9-6-12," they [p]resumably would have reasonably determined [D.D.H.] was totally disabled."  Her argument is wholly unconvincing. Given the evidence of surgical repair, lack of follow-up treatment or complaints to medical professionals, and the ALJ's evaluation of the mother's testimony and medical records about D.D.H.'s ambulation, the court finds the ALJ was justified in relying on the administrative record to reach her conclusion that a listing was not met or equaled.  Any possible error in this case because of the lack of a medical expert's evaluation of the listings with respect to D.D.H.'s hip impairment and ambulation is harmless.  *See McKinzey v. Astrue,* 641 F.3d 884, 892 (7th Cir. 2011)

(administrative error can be harmless; court will not remand for further specification when convinced same result would be reached).

### B.   The ALJ's Evaluation of Asthma Listing 103.03C2

D.D.H. contends the evidence supported a finding that listing 103.03C2 was met or medically equaled.  That listing requires asthma with "[p]ersistent low-grade wheezing between acute attacks or absence of extended symptom free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with . . . [s]hort courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period."  In evaluating this listing, the ALJ emphasized the absence of persistent low-grade wheezing and the absence of the required "short courses/bursts of steroids."  Her evaluation is well-supported.

The ALJ noted that although D.D.H. had seen a doctor on May 2, 2011, for wheezing symptoms and was prescribed an Albuterol nebulizer at that time, when D.D.H. was seen by the consultative physician on August 13, 2011, her lungs were clear with no wheezing and the doctor concluded D.D.H. had "very mild asthma." (R. 15).  The only other medical evidence of wheezing was an examination on August 20, 2012, and D.D.H.'s physician prescribed Albuterol and budesonide (R. 199), a medication used to help prevent asthma symptoms that is designed to be used daily to prevent inflammation in the lungs.  *See* http://www.mayoclinic.org/ drugs-supplements/budesonide-inhalation-route/description/drg-20071233.  As to corticosteroid therapy, the ALJ reasonably found there was no evidence of the required short courses of steroid treatment.  D.D.H. argues that the budesonide

10

medication is a steroid that satisfies the listing.   The budesonide medication regime prescribed to D.D.H. was expressly noted, however, by the consultative physician and by the agency reviewing physicians who concluded D.D.H.'s asthma was not even a severe impairment.   The consultative physician's report recognized that D.D.H. took a budesonide medication under the trade name "Pulmicort,"[2] and concluded D.D.H. has "very mild asthma which should be controlled with albuterol and Pulmicort."  (R. 183).   The agency reviewing physicians who concluded D.D.H.'s asthma was not disabling noted D.D.H. had a history of asthma that was treated with Albuterol and Pulmicort.  (R. 184).   These physicians had reviewed all of the medical evidence of D.D.H.'s asthma except for the single treatment on August 20, 2012, which was the first medical visit relating to asthma since May 2011.  D.D.H.'s budesonide medication was not ignored by the ALJ and her decision that no listing was met or medically equaled has rational support in the evidence, including her reliance on the evaluations by the consultative examiner and agency reviewing physicians.

## C.    The ALJ's Functionality Evaluation

D.D.H. contends the ALJ erred in evaluating her functionality within the six domains. This argument is wholly undeveloped and is presented in two sentences in the opening brief without any analysis.  The brief states:  "The claimant was functionally disabled because she obviously had Marked impairments in the Moving

---

[2]    *See* http://www.mayoclinic.org/drugs-supplements/budesonide-inhalation-route/description/drg-20071233 (identifying Pulmicort as US brand name for budesonide)

About and Manipulating objects domain and in the Health and Physical Well-Being domain due to her chronic asthma and inability to ambulate effectively.  The ALJ's determination that she had only 'less than marked limitation' in these domains (R. 21, 23) was plainly contrary to the evidence."  (Dkt. 17 at pp. 7-8).  The reply brief "expands" on these conclusory statements by contending D.D.H. should have been found to be markedly limited because she "clearly" has ineffective ambulation, and because she is not able to play normally with other children because of shortness of breath due to asthma and severe hip pain.  (Dkt. 19 at pp. 4-5).  These contentions seek a reweighing of the evidence, which the court may not do, and they ignore the evidence relied on by the ALJ in her analysis. That evidence included D.D.H.'s abilities to move around (crawling and walking) at appropriate age milestones and the surgical repair of her hip malformation. The ALJ's decisions that less than marked limitations were present in the moving around and health and well-being domains are supported with relevant evidence adequate to support her conclusions.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge AFFIRM the Commissioner's decision.  Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file objections within 14 days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.


Dated:  August 12, 2015


_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana


Distribution:
All ECF-registered counsel of record by email through the court's ECF system